ceptance of the bill was refused; and, to avoid the legal consequence of a protest, to fix upon the drawer payment of damages, which, by an agreement between drawer and payee, were not to be demanded, the bill was returned without being protested, this agreement having been communicated by the defendant to the drawee. This action was brought before the time for payment by the drawee would have arrived, had he accepted the bill.

Ewing, for the plaintiff, stated, first, that where the drawer has no funds in the hands of the drawee, neither protest, nor notice to the drawer, is necessary to enable the payee to recover. 1 Term R. 714, 410; 2 Term R. 717; 5 Term R. 239. Plaintiff must either state that the bill was protested, or show that it was not incumbent on him to protest; as, that the drawer had no effects in the hands of the drawee; but, the omission can only be taken advantage of by special demurrer. 1 Salk. 131; 1 Show. 125; 2 Doug. 684, note 144. Not even necessary to present it for acceptance. Chit. Bills, 68; 2 H. Bl. 336, and post. 2d. That the action was not brought prematurely. It may be commenced immediately on non-acceptance. 3 Burrows, 1687. 1 Doug. 55; 3 East, 481; Chit. Bills, 64, 100.

These points were admitted by Mr. Dallas for the defendant, who stated the case to be, that the defendant was indebted to one Niblie, of New Orleans, who again was indebted to the plaintiff: that, by the correspondence between Niblie and the plaintiff, it appeared, that the defendant was to pay to the plaintiff, what he owed to Niblie. In August, 1804, Niblie drew an order on the defendant for 500 dollars, in favour of one Vertner, at sixty days, which was accepted. This bill was drawn in December, afterwards. He contended, that the plaintiff was to be considered as the agent of Niblie; and, as the bill was drawn for the whole sum, which had been due from defendant to Niblie, without crediting the above 500 dollars, the defendant was entitled to a credit for that sum, the suit being between the original parties to the bill. [Verdict and judgment for plaintiff.]

Before WASHINGTON, Circuit Justice, and PETERS, District Judge.

WASHINGTON, Circuit Justice, charged the jury. The argument, founded on the idea of the plaintiff being the agent of Niblie, is ingenious, and would be sound, if the case would bear it out. If the plaintiff had not been the creditor of Niblie, we might have considered him as his agent. But, as the case is, it is nothing more than a promise by the defendant, to pay to the plaintiff, a creditor of Niblie, a debt due to him by Niblie, and the bill is evidence of this promise. It is of no consequence, if the defendant, instead of having paid a part, had previously discharged the whole of his debt to Niblie;

he is still bound to fulfil his engagement to the plaintiff. Verdict for plaintiff, for his whole demand.

## Case No. 769.

### BAKER et al. v. GLOVER.

[2 Cranch, C. C. 682.][1]

Circuit Court, District of Columbia. May Term, 1826.

EQUITY—INJUNCTION TO STAY EXECUTION—SURPRISE.

A court of equity will grant an injunction to stay execution upon a judgment obtained against a garnishee by surprise and will continue it till final hearing.

In equity. This was a bill [by Baker and others against Charles Glover] for an injunction to stay proceedings upon a judgment against the complainants as garnishees of Edward Smith by default, and for general relief. [Decree for complainants.]

The bill stated, that in February, 1818, the defendant Charles Glover, issued an attachment against Edward Smith, under the Maryland act of 1795, (chapter 56,) which was returned, "Laid in the hands of Elizabeth Baker, John R. Dyer, Edward Dyer, and Thomas Munroe, and summoned them as garnishees." That at the time of the service of the attachment, neither of the garnishees had any goods or chattels of Smith in their possession, and that neither of them was indebted to him. That relying on that fact, and being ignorant of the law and the proceedings of courts, they failed to appear at the return of the attachment, whereby they are informed that judgment of condemnation by default was entered against them as garnishees for $260 and costs, at June term, 1818, and that execution thereupon is in the hands of the marshal, who is about to levy on the property of the complainants. That the proceedings at law were illegal and void, inasmuch as the judgment was rendered against one of the complainants by the name of Elizabeth, when her name was Catharine; that there is no return on the capias against Smith, and no short copy of the cause of action set up at the court-house door. The bill then prays an injunction, and for general relief.

An injunction was granted in vacation by Thruston, Circuit Judge. The answer denies that the complainant Baker was not indebted to Smith. It avers that the defendant believes that the proceedings at law upon the attachment were correct and proper, and that a short note of the cause of action was set up at the court-house door, which the defendant himself saw. As to that part of the bill which complains that no return was made on the capias against Smith, the defendant answers, that before the capias was

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

issued Smith had absconded and has not returned.

Mr. Morfit, for the defendant Glover, contended that by the rules of equity an injunction cannot be granted to stay execution upon a judgment by default. Graves v. Houlditch, 2 Price, 147; Ham. Eq. Dig. 503. That the complainant had a complete remedy at law, under the Maryland act of 1787, (chapter 9, § 6,) by a motion to set aside tne judgment for surprise or irregularity, and to quash the execution. Cheetham v. Tillotson, 4 Johns. 500; 1 Johns. Cas. 429. That therefore there was no equity in the bill.

Mr. Key then moved the court to quash the execution, and to set aside the judgment at law against the garnishees rendered at June term, 1818, for irregularity. 1. Because there was no return of the capias against Smith. 2. Because there was no short note set up at the court-house door. 3. Because there was no evidence by which "to make appear to the court" what "goods, or chattels, or credits of the defendant were in each respective garnishee's hands," according to the provisions of the 4th section of the act of Maryland, 1715, (chapter 40.)

THE COURT ordered the injunction, and the motion to set aside the judgment and quash the execution, to be continued till the final hearing upon the cause in equity.

NOTE. Glover died, and the cause was abated.

BAKER, (GOLDSBOROUGH v.) See Case No. 5,516.

## Case No. 770.
### BAKER v. HEMENWAY.
### The CITY OF VALPARAISO.
[2 Lowell, 501.] [1]
District Court, D. Massachusetts. Nov., 1876.

SALVAGE—TOWAGE AND SALVAGE—AMOUNT DECREED.

1. A steamship, worth, with her cargo, $500,-000, took the ground in the harbor of Boston; and was pulled off, at about high water, by a large tug, assisted by the engines of the steamship, and by two small tugs, the principal power being furnished by the ship and the large tug, and the small tugs being occupied less than an hour. *Held*, that the small tugs had rendered a salvage service.
[Cited in The Athenian, 3 Fed. 250.]

2. That they were to be paid a liberal compensation, much more than their hire for an hour, but not one into which the value saved would enter as a very important element: Sums decreed, $800 and $400.
[Cited in The Athenian, 3 Fed. 250.]

[In admiralty. Libel by Baker and others against the steamship City of Valparaiso

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

(Hemenway, claimant) for salvage.] The City of Valparaiso was a new steamship, built in England, and intended for the trade between Boston and Chili. In going down the harbor of Boston on her first voyage she grounded on Lovell's island in the daytime, about an hour and a half or two hours before high water. The wind was strong from the north-west, and tended to set her further on the shoal. She had a large and powerful tug, called the C. S. Winch, in attendance, to bring back some passengers; and, while lying aground and backing her own engines with all their power, she accepted the services of the two comparatively small tugs, the Macy and the Woolley, whose owners and crews bring this libel. The Macy assisted the Winch in pushing against the steamer's quarter, to keep her up to the wind; the Woolley assisted in drawing her off. The steamer was aground a little more than an hour. The facts were not seriously disputed; but the opinions of the witnesses were opposed upon the question how far the services of the tugs were important to the safety of the ship, her own witnesses testifying that she had ample means to haul off by anchors, &c., in addition to her engines, in case those alone had failed. The after-part of the ship was lightened by pumping out the water ballast. The vessel pursued her voyage to Valparaiso and back, and on her return was found to have been considerably injured by taking the ground, though the leak caused by it was not large. The ship and cargo were worth nearly half a million dollars. [Decree for libellants.]

J. C. Dodge, for libellants.
E. R. Hoar & S. Hoar, for respondent.

LOWELL, District Judge. That a vessel in distress accepting services without a special contract, and in the absence of a usage of the port, accepts a salvage assistance, is abundantly established. It will be enough to cite some of the decisions in this circuit, though the law is the same in all: The Versailles, [Case No. 6,365;] The Independence, [Id. 7,014;] The Island City, [Id. 55;] The Susan, [Id. 13,630;] The James T. Abbott, [Id. 7,202;] M. B. Stetson, [Id. 9,363;] The Coringa, [Id. 1,736.]

The important and difficult part of the case is not the name by which it is called, but the amount which shall be decreed. A very large value was saved, but under circumstances which do not contain other elements which should require the quantum to be large. The service resembled towage. I do not mean that there is any generic difference between towage and salvage. In the absence of a contract, the towing of a vessel in peril or disabled is salvage; but as a convenient word to distinguish an ordinary case of contract from one of salvage, "towage" is often used.

The increased use of tugs, and their rival-